[No. 45493. En Banc. February 15, 1979.]

JOHN GRIFFIN, ET AL, *Appellants,* v. THE DEPART-MENT OF SOCIAL AND HEALTH SERVICES, *Respondent.*

618

*Sweet & Dussault,* by *William L. E. Dussault,* for appellants.

*Slade Gorton, Attorney General,* and *Robert M. McDonald, Assistant,* for respondent.

STAFFORD, J.—This case was certified by the Court of Appeals. Appellants, John and Kristen Griffin, the natural parents of a mentally and physically handicapped child, challenge the authority of respondent Department of Social and Health Services (Department) to bill them for a portion of the cost of foster care. We affirm the departmental charge.

The parties appear to agree that in June 1969, on the

recommendation of physicians at the University of Washington, John Griffin, Jr. (Johnny), then 11 years of age, was placed in the Rainier School for the Retarded (Rainier) under voluntary admission procedures. Rainier is a state residential school established pursuant to RCW 72.33. Johnny remained there until October 1970 at which time he was placed in a group home operated by the University of Puget Sound (UPS). He lived in the group home until the facility closed 3 1/2 years later due to lack of state funding. The record does not indicate whether the Department, the Griffins, or both believed Johnny would regress if returned to Rainier. Whatever the origin of the belief, Johnny was not readmitted to Rainier. As a result, the Griffins began seeking a new group home for their son with the assistance of the Bureau of Developmental Disabilities (Bureau), a subunit of the Department. One of the staff members of the UPS group home cared for Johnny while the new placement was sought. When that person was no longer able to care for Johnny, appellants took him back into their home. After 2 weeks they were unable to cope with his behavior and the Bureau temporarily placed him in another state residential school although it was designed for younger children. Neither the Griffins nor the Bureau were able to locate a group home that would accept, on a permanent basis, a child with Johnny's problems. Consequently, in September 1974, the Griffins applied to place Johnny in a foster home where he lived until the time this action was initiated.

On September 4, 1975, the Department served upon the Griffins a notice and finding of financial responsibility stating that, beginning August 1975, they would be charged $140 a month for Johnny's support and that a debt amount of $1,043.57 had accrued for his care between September 1974 and July 1975. The Griffins had not been charged for Johnny's care while he was a resident at either Rainier or the group home. Pursuant to statute they filed an objection to the notice and an administrative hearing was held on

October 10, 1975. The hearing examiner, taking into account the parents' income and presence of another minor child in the home reduced the monthly charge to $75 and recalculated the accrued debt to be $1,028.69 through October 1975. The charge was based specifically on RCW 74.20A.055.

■ The Griffins petitioned the Superior Court for review of the hearing examiner's decision pursuant to RCW 74.20A.055 and RCW 34.04.130. The only evidence before the Superior Court was the record of the administrative hearing. RCW 34.04.130(5). After review of the record, the trial court adopted the findings of fact and the conclusions of law made by the hearings examiner and affirmed the examiner's financial order. The Griffins appealed the decision of the trial court pursuant to RCW 34.04.140. Since the only evidence before the Superior Court was the record of the administrative hearing, we may evaluate only that evidence. *Newbury v. Department of Pub. Assist.*, 80 Wn.2d 13, 491 P.2d 235 (1971).

Appellants challenge the action of the Department on four primary grounds: (1) the Department did not have statutory authority to bill appellants for the partial cost of foster care for their child; (2) the practice of billing parents of handicapped children placed in *foster care* while not billing the parents of similarly handicapped children placed in *residential or group homes* denies the former equal protection; (3) appellants' child was denied equal protection by being forced to reside in a foster home when other similarly handicapped persons were placed in residential and group homes; and (4) the Department is equitably estopped from collecting payments from appellants.

Concerning the first issue, appellants assert the hearing examiner, and thus the Superior Court erred in holding the Department had statutory authority to bill them for the partial cost of foster care for their son. We disagree and affirm the trial court's determination of statutory authority.

The hearing examiner and the Superior Court concluded the Department had authority to bill appellants under

WAC 388–11–010 and RCW 74.20A.055. RCW 74.20A.055 establishes the procedures for serving a notice and finding of financial responsibility. WAC 388–11–010 notes the instances in which such notice may be served:

> The notice and finding of financial responsibility may be served only for a support debt or responsibility to support accrued and/or to be established under RCW 74.20A.030, RCW 74.20.292, or RCW 26.16.205 and/or RCW 74.20A.250 . . .

Appellants contend all placements made for Johnny, including the referral to foster care, were controlled by the Department through the Bureau and as such were governed by RCW 72.33. In essence, appellants argue that from the time Johnny was placed at Rainier under the authority of RCW 72.33.125, through the time he was placed under foster care, he remained under the overall jurisdiction of the Department and thus was covered by RCW 72.33.

According to appellants the *exclusive* methods by which the State may collect a debt from a person originally admitted to state residential schools under RCW 72.33.125 are billing a resident who possesses assets above the minimum amount needed for personal use (RCW 72.33.650) or billing the estate of a resident for the per capita cost of that resident's care, support and treatment (RCW 72.33.655). Consequently, appellants argue, there is no authority for the State to bill the parents of former residents of state residential institutions since there is no reference to RCW 72.33 in WAC 333–11–010. On the other hand, respondent Department contends Johnny was placed in foster care voluntarily, an act totally independent of his earlier voluntary placement at Rainier and thus argues that the charges are wholly independent of RCW 72.33.

RCW 72.33 establishes state residential schools as well as procedures for placement of handicapped persons in day treatment centers and group homes. Parents who wish to place a child under the protection of this chapter may apply to the Department for access to state services as

appellants did in the instant case. Thereafter the Department will make the initial determination of appropriate placement. RCW 72.33.125. When a handicapped person is placed in a residential school under RCW 72.33 the *exclusive* method for recoupment of costs for care and treatment of the resident, *while in the residential school,* is provided by RCW 72.33.650 and RCW 72.33.655.

Once admitted to a residential school, a person may be withdrawn in one of two ways: (1) through placement outside of the school; or (2) discharge. Discharge involves the state's relinquishment of all rights and responsibility it may have acquired by the acceptance of a resident. RCW 72.33-.020(12). Placement outside of the school may be made either on the initiative of the resident or his parents under RCW 72.33.140 or on the initiative of the Department under RCW 72.33.160.

Because Johnny had been a resident of Rainier and subsequently had been placed in a group home, payment for his group home care is governed expressly by RCW 72.33-.830 and .840. RCW 72.33.830 authorizes the Department to pay for all or part of the cost of care and training of those residents of state residential schools *who are placed in group homes.* RCW 72.33.840 indicates that such payments should

> insofar as reasonably possible, be supplementary to payments to be made . . . by the estate of such resident of the state residential school, or from any resource which such resident may have . . .

The foregoing statutory sections clearly establish that from the time Johnny was placed at Rainier until his tenure at the UPS home was terminated, his parents could not have been billed directly for the cost of his care. It must be noted that the State made no attempt to do so.

The statutory provisions for payment where a person, *originally placed in a residential school,* is transferred to a group home are to be contrasted with the statutory sections that govern payment where the *original placement is made in a group home.* In the latter situation, the Department is

authorized to pay part or all of the cost of care and maintenance of handicapped persons in day training centers and group homes (RCW 72.33.800), but such payments "shall be, insofar as possible, *supplementary to payments to be made . . . by the parents* or guardians of such mentally retarded or other developmentally disabled persons." (Italics ours.) RCW 72.33.805. If parents desire state financial assistance for all or a portion of the monthly cost of care, treatment, maintenance, support and training, they must apply for it pursuant to RCW 72.33.815.

We recite these specific statutory sections to illustrate the care with which the Legislature constructed the relative financial responsibilities of the state, the resident or his estate, and the parents of the resident under RCW 72.33. The Legislature clearly indicated, by these sections, that the nature of the placement of a handicapped person has an impact on how the financial burden is to be shared.

■ Despite the express provision in RCW 72.33 for financial responsibility when a handicapped person is placed in a residential school, group home, or day training center, that chapter does not provide expressly for financial responsibility where a person, once admitted to a state residential school is later transferred to a group home and thereafter placed in foster care. Thus, reference to RCW 72.33 alone provides no express guidance on the sharing of financial responsibility in a case such as this.

We are not limited to RCW 72.33 in divining the intent of the Legislature, however. The Legislature's careful coverage of financial responsibility in the area of residential schools, day centers and group homes and its obvious silence on the subject of financial responsibility in the area of foster care placement indicates an intent that the provision for financial responsibility for foster care placement is not meant to be in RCW 72.33, but is to be found elsewhere. It is clear, however, that an interrelationship was intended between residential schools, group homes, training centers and foster homes. RCW 72.33.080 authorizes the Department to assist superintendents of residential schools

in finding suitable foster care placements for those residents who would be best served thereby.

RCW 74.20A.030 states:

> any payment of public assistance money made to or for the benefit of any dependent child . . . creates a debt due and owing to the department by the natural . . . parents who are responsible for support of such children in an amount equal to the amount of public assistance money so paid . . .

Consistent therewith, WAC 388–70–010(2) provides that foster care payments are vendor payments of public assistance funds. "Dependent child" is defined as any person under the age of 21 who is not emancipated, self–supporting or married. RCW 74.20A.020(3). This clearly includes Johnny. WAC 388–11–010, which authorizes findings of financial responsibility, is based specifically on RCW 74.20A.030. Consequently, the Department had statutory authority to bill appellants as natural parents of Johnny.

■ Clearly appellants desired to have Johnny's placement in a foster home treated as a continuation of his earlier commitment to the state–funded residential institution and sought to avoid any personal payment for his support whatsoever. But, despite their desire, the Legislature's intent that parents be financially responsible for the care of their children is also clear as is the *total* statutory scheme surrounding the placement of handicapped persons. When such a person is placed in a state residential school, the State may look to the *resident*'s assets for reimbursement of a portion of the cost of care and treatment under RCW 72.33.650 and .655. When a dependent child, handicapped or not, is placed under foster care, the State may look to the *parents* for financial contribution to the cost of the child's care under RCW 74.20A.030. The Legislature chose neither to include handicapped children placed in foster care under the former statute nor to exclude them under the latter. Where the language of a statute is clear, we will respect it. *Hatfield v. Greco,* 87 Wn.2d 780, 781, 557 P.2d 340 (1976).

 Next, appellants contend the nature of the foster care application they signed relieved them of any duty to pay for foster care despite a legislative design to the contrary. We do not agree. To obtain foster care for their children, parents must complete certain printed forms provided by the Department. Appellants unilaterally changed the printed form by which a parent normally gives consent to placement of a child in a foster home. By interlineation they added that the placement was being made "pursuant to our original commitment of said child to the Department of Social and Health Services." In addition, appellants amended the printed form by drawing a line through a reference to their duty to support the child while in foster care. Appellants argue that by accepting the unilaterally altered standard forms, the State is precluded from billing them for their son's foster care.

Appellants' contention is without merit. As indicated, the statutes and regulations clearly provide that natural parents are responsible for foster care payments and that the State may recoup its costs from the parents. Applicant-parents cannot abrogate their statutory duty of support by the simple act of unilaterally altering printed application forms. Further, the mere receipt of such an altered form by a state employee does not constitute an acceptance of the alterations.[1] This is particularly true where, as here, appellants' alterations are capable of several interpretations.

Appellants suggest, incorrectly, that a failure to accept their contention would result in the creation of an unconscionable contract. However, in a contractual sense there was no consideration to support the unilaterally altered

---

[1] The Department employee who accepted the application is not shown to have done more than witness the signatures of Mr. and Mrs. Griffin. This act did not signify assent to the alteration, however. Further, appellants cite no cases to establish that by such an act of an employee of the Department the statutory duty of a parent can be abrogated. We will not consider an assertion on appeal if it is not supported by citation of authority unless well taken on its face. *State v. Kroll,* 87 Wn.2d 829, 558 P.2d 173 (1976).

agreement. Such a lack of consideration is critical in a situation where, as here, a party (*i.e.*, the Department herein) entitled to payment by law, is said to have "agreed" to a proposal that it abrogate its statutory duty to collect payment for those services. Nor can it be said that the Department "waived" a statutory duty to assert the parents' responsibility to pay for support of their child in a foster home. Additionally, there is neither proof that the parents acted in reliance upon any act of the State nor claim that they acted to their detriment. Although appellants assert unfairness, they clearly benefited from this "transaction" with the State. They were unable to cope with their son's problems. As a result of their application for foster care, Johnny was placed with a foster family capable of doing so. Additionally, appellants were not without redress when they were charged for Johnny's care. They had a right to a hearing after they received the notice of financial responsibility and a right to review of the hearing examiner's decision by the Superior Court, both of which appellants pursued. Appellants do not claim the amount of monthly support determined by the hearing examiner was unreasonable or that they are unable to pay. Rather, they object to paying anything at all.

We affirm the trial court's upholding of the trial examiner's conclusion that the Department had authority, under WAC 388–11–010 and RCW 74.20A.030, to bill appellants for a portion of the cost of their son's foster care.

The second issue raised by appellants is whether billing natural parents of handicapped children placed in foster homes for the cost of care and support violates equal protection of the law. After all, it is urged, parents of similarly handicapped persons placed in state residential schools and group homes are not billed.

Appellants state correctly that the equal protection clause of the fourteenth amendment to the United States Constitution forbids a state from denying any persons within its jurisdiction the equal protection of its laws. Further, article 1, section 12 of the Washington Constitution provides:

No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations.

As we said in *Housing Authority v. Saylors,* 87 Wn.2d 732, 738–39, 557 P.2d 321 (1976), the state clause generally is given the same interpretation as the federal clause.

■ Handicapped persons have neither been deemed part of a suspect classification nor has the asserted right to care and treatment been recognized as fundamental in nature. Consequently, the parties correctly apply the "rational relationship" test to the challenged statutory scheme.

■ Legislation involving nonfundamental and nonsuspect classifications must satisfy two requirements under the "rational relationship" test: (1) it must apply alike to all members within the designated class and (2) reasonable grounds must exist for making a distinction between those falling within the class and those falling outside of it. *Belancsik v. Overlake Memorial Hosp.,* 80 Wn.2d 111, 115, 492 P.2d 219 (1971). In one of our more recent discussions on the subject we said:

> It is the well–established rule of law in this state that a statutory classification having some reasonable basis does not offend the equal protection clause or the privileges and immunities clause. In order to successfully attack a particular classification, it must be shown that such classification is manifestly arbitrary, unreasonable, inequitable, and unjust.
>
> Accordingly, the question is not whether the statute is discriminatory in nature, nor is it of paramount concern if the classification results in some inequality. The crucial determination is whether there are reasonable and justifiable grounds giving rise to the classification. Finally, in making this determination, it is recognized that the legislature has a wide range of discretion in defining the classifications and that such enactments are presumptively valid.

(Citations omitted.) *Childers v. Childers,* 89 Wn.2d 592, 604–05, 575 P.2d 201 (1978), quoting *Sparkman & McLean*

*Co. v. Govan Inv. Trust,* 78 Wn.2d 584, 588, 478 P.2d 232 (1970).

Appellants contend the statutory scheme treats Johnny in a way different than it treats other handicapped children placed in either residential schools or group homes in that the latter are not required to pay for their care. They argue that if one member of a class of handicapped persons is entitled to care at no cost under RCW 72.33, all members similarly situated are similarly entitled.

As we discussed above, the State does bill *residents* of state *residential schools* and *group homes* under RCW 72.33.650, .655 and .850. The real challenge here involves not the fact of billing but *who* is billed for foster home care. The question boils down to the simple issue of whether the *resident* or his *estate* under RCW 72.33 should be billed or whether the *parents* may be billed under RCW 74.20A.

The statute in question is RCW 74.20A.030. Our first consideration is whether that statute applies alike to *all* persons within the designated class. The classification to be tested is that of handicapped persons placed in *foster homes* since this is the precise designation challenged by appellants. The statute applies equally to all persons within that class (*i.e.,* all handicapped persons placed in foster homes). Thus, the first requirement under the "rational relationship" test is met.

The more difficult question is whether there is a reasonable basis for distinguishing between dependent handicapped children placed in *foster care* and handicapped persons receiving care in state *residential schools* and *group homes*. That is, is there a rational basis for creation of the class singled out.

■ As respondent points out, a rational basis exists for differentiating between payment for *foster* care by *parents*. It is found in the purpose behind the type of care itself. The purpose of *foster home* placement is to *care for* and *supervise* dependent children (RCW 74.15.020). On the other hand, the purpose of *state residential schools* is to *care for, treat and educate* handicapped persons (RCW

72.33.010), and the purpose for *group homes* is to *care for, treat, train and maintain* developmentally disabled persons (RCW 72.33.800(2)). The distinction between these purposes is sufficient to justify a distinction between classifications thus permitting the State to charge *parents* in the case of *foster* care while authorizing a charge only against the handicapped *resident* with respect to *residential schools* and *group homes.* While it is conceivable that on occasion a resident of a *school* or *group home* might receive more in pecuniary value than one receives in a *foster home* this question goes to the correct amount to bill in an individual case rather than to the question of who should be billed or whether one should be billed at all.

Even stronger support for rationality of the classification is found in the reasonable attempt by the Legislature to solve a complex and expensive social problem. The Legislature chose to construct RCW 74.20A in such a fashion that, where possible, children would be maintained by the resources of their parents, thereby relieving, in part, the burden borne by the general citizenry. RCW 74.20A.010. We recognized the validity of a similar purpose behind RCW 72.33.650–.700 when those statutes were challenged unsuccessfully on equal protection grounds. We held:

> that the challenged legislation is a legitimate attempt by the legislature to reduce the burden on the taxpayer by forcing the estate of each resident to shoulder a share of the costs of his care and maintenance.

*O'Connell v. Conte,* 76 Wn.2d 280, 284, 456 P.2d 317 (1969). The foster care statute applies primarily to the care and supervision of children. It is reasonable for the State to look to their parents for financial assistance rather than to the personal assets of the child. On the other hand, both children and adults are placed in residential homes and thus the financial scheme designed to reimburse the State for the operation of these facilities through the personal assets of the residents in general is reasonable. In addition, it is logical to assume the Legislature may have recognized that the cost of individualized care in foster homes would

be greater than the cost of care in a group environment. We have held that every reasonable basis that can be conceived of as having existed when the law was adopted will be assumed. *Aetna Life Ins. Co. v. Washington Life & Dis. Ins. Guar. Ass'n,* 83 Wn.2d 523, 520 P.2d 162 (1974).

In sum, we hold the statutory scheme under which appellants were billed for the cost of their handicapped child's foster care does not violate the equal protection clauses of either the state or federal constitutions.

Appellants' third contention is that the Superior Court erred in failing to rule on whether their son was denied equal protection by being forced to reside in a foster home when other similarly handicapped individuals are placed in state residential schools or group homes. The essence of appellants' challenge is that the failure of the State to allocate adequate funds to support group homes resulted in foster care placement being the only alternative open to them. Linked to this challenge is the assertion that the State is *required* to provide residential school and group home placement under RCW 72.33.

Appellants cite no authority to support the proposition that the State owes a legal duty to continue indefinitely with the care and treatment of a child once admitted to a residential school or group home and we are aware of none. Where contentions raised on appeal are not supported by citation of authority we will not consider them unless well taken on their face. *State v. Kroll,* 87 Wn.2d 829, 558 P.2d 173 (1976). The State's relationship with group homes is a financial and regulatory one in which the Department is authorized to enter into agreements with private owners of group homes to assist with the costs of care, treatment and training for handicapped persons. *See* RCW 72.33.800.–850.

In addition, there is no evidence that Johnny is being denied services that similarly handicapped children are receiving. In fact, Mrs. Griffin testified at the administrative hearing that Rainier was not able to provide the remedial care required by their child. She also testified that

certain group homes refused to take children with her son's behavioral and dietary problems. Thus, by her own testimony, Mrs. Griffin has suggested that another child similarly handicapped would not find adequate treatment at either a residential or a group home. In addition we note that no evidence was presented at the administrative hearing concerning Johnny's specific medical condition. Also there was no evidence presented to establish that facilities exist, other than a foster home, capable of treating him or that the state of the medical arts is advanced enough to help him in any event. Most significantly, no evidence was presented to establish that placement in either a group home or a residential school would be better for Johnny than his placement in foster care. The absence of such evidence precludes us, as it precluded the hearing examiner and the lower court, from determining whether Johnny was denied equal protection in this regard.

■■ Appellants' final contention is that the Department is equitably estopped from billing them for Johnny's foster care. Our review of the record indicates that appellants did not raise this issue before either the hearing examiner or the trial court. Failure to raise issues during the course of an administrative hearing precludes the consideration of such issues on review. *Leschi Improvement Council v. State Highway Comm'n,* 84 Wn.2d 271, 525 P.2d 774 (1974). However, it should be pointed out that the record is devoid of evidence that appellants acted in reliance on any act of the State or that they acted in any way to their detriment, both of which would be required to equitably estop the State from billing appellants. *Metropolitan Park Dist. v. State,* 85 Wn.2d 821, 827–28, 539 P.2d 854 (1975).

The order of the trial court is affirmed.

UTTER, C.J., and ROSELLINI, WRIGHT, BRACHTENBACH, HOROWITZ, DOLLIVER, and HICKS, JJ., concur.

Reconsideration denied March 23, 1979.