947 P.2d 1208 (1997)
133 Wash.2d 861
CITIZENS FOR MOUNT VERNON, a Washington nonprofit corporation, Respondent,
v.
CITY OF MOUNT VERNON, a municipal corporation; Robert S. Peterson, as his separate estate; Briar Development Company; a Washington corporation; Haggen, Inc., a Washington corporation, Appellants.
No. 63823-3.
Supreme Court of Washington, En Banc.
Argued May 20, 1997.
Decided December 18, 1997.
*1209 C. Thomas Moser, Mount Vernon, Buck & Gordon, Peter L. Buck, Kitteridge Oldham, Seattle, Linford C. Smith, Mount Vernon, Hutchison, Foster & Weigelt, William B. Foster, III, Lynnwood, for Appellants.
Law Offices of J. Richard Aramburu, J. Richard Aramburu, Jeffrey Eustis, Seattle, for Respondent.
JOHNSON, Justice.
Appellants, Briar Development Company and Haggen, Inc. (Haggen), appeal a superior court order which reversed a decision of the Mount Vernon City Council approving a commercial planned unit development. Appellants contend Mount Vernon's comprehensive plan and zoning code authorize approval *1210 of a commercial planned unit development in a neighborhood zoned residential and on property zoned for single family residences. We affirm the superior court.

FACTS
On April 14, 1995, Haggen applied to the planning director of the city of Mount Vernon for approval of a commercial planned unit development (PUD). Haggen requested a 39.3-acre property be annexed into the city of Mount Vernon and rezoned "R-2A" (single family attached townhouse residential district) and "P" (public park). Additionally, Haggen requested approval of a commercial PUD which would overlay the entire 39.3-acre property and potentially permit construction of the commercial project in a residential neighborhood. Haggen wanted to construct a commercial PUD consisting of a 63,000+ -square-foot grocery/specialty store covering 8.3 acres of the 39.3-acre property. Haggen also intended to construct a 1.4-acre commercial pad and a residential development of approximately 42 to 58 units on 8.4 acres.
In January 1995, before the Haggen development request, the Mount Vernon City Council adopted a new comprehensive plan for the city under the Growth Management Act (GMA), RCW 36.70A. At this time the Mount Vernon City Council had not yet adopted specific development regulations as required by RCW 36.70A.040. Mount Vernon did have an existing zoning code.
The zoning regulations governing this specific property are somewhat unclear. Prior to the annexation and the rezone, the site was an unincorporated island, wholly surrounded by city property, zoned "P" (Public/Park) and "C-LI" (Commercial/Light Industrial) under Skagit County zoning regulations. Under the comprehensive plan adopted by the city council in accordance with the GMA, the property appears to be zoned multiple family and medium density single family residential. Although the comprehensive plan suggests the area in which this property is located may need some type of commercial development in the future, the comprehensive plan does not specify the size, intensity, or location of any future commercial development. These areas of potential future commercial development are designated by large circles in the Mount Vernon comprehensive plan.
The comprehensive plan includes five different types of commercial retail zones. These retail centers include: downtown, mall area, community, neighborhood, and convenience. The comprehensive plan designates areas within Mount Vernon for these commercial zones, and the comprehensive plan describes the standards governing commercial development. The comprehensive plan also designates areas with "future potential need for Neighborhood Community Retail." The Haggen property lies within the Neighborhood Community Retail area under the plan.
On August 1, 1995, the Mount Vernon planning commission voted on the underlying zoning of R-2A and P; the planned unit development overlay; the master plan for the entire parcel; and the preliminary planned unit development for the commercial portion. The planning commission vote on the entire proposal ended in a 3-3 tie. The issue was passed to the city council without recommendation from the planning commission.
Public hearings on the annexation, the proposed initial zoning, the master plan, and the preliminary planned unit development were held on two separate dates in September 1995 by the city council. On each occasion, residents voiced their opinions both for and against the project. At the September 27, 1995 meeting of the city council two votes were taken. The first vote approved the annexation of the approximately 40 acres into the city of Mount Vernon and the underlying rezone to R-2A and P. The second vote approved adoption of the master plan and the preliminary planned unit development.
On October 18, 1995, Respondent Citizens for Mount Vernon (Citizens) filed an action as a land use petition under the Land Use Petition Act[1] in Skagit County Superior Court. After reviewing the record and hearing oral argument, the superior court entered *1211 an order reversing the city council's approval of the Haggen commercial planned unit development. Specifically, the court determined: (1) without implementing development regulations, the comprehensive plan fails to provide specific standards for making specific land use decisions; (2) even if the comprehensive plan can be used as an approval document, the approval of this project and the R-2A zone is inconsistent with the comprehensive plan; (3) the project is inconsistent with existing zoning regulations; and (4) Citizens exhausted its administrative remedies and was not required to appeal specific land use issues to the Growth Management Hearing Board (Board). Haggen appealed this decision to this court, which accepted direct review.

ANALYSIS

Exhaustion of Remedies
Before reaching the merits of the case, we must address Haggen's argument that a city council's approval of a land use project must be appealed to the Growth Management Hearings Board to comply with the exhaustion of administrative remedies requirement. The trial court found Citizens did not fail to exhaust its remedies and had standing because issues of noncompliance with zoning and planning laws were adequately raised at public hearings and through written correspondence.
The doctrine of exhaustion of administrative remedies is well established in Washington. A party must generally exhaust all available administrative remedies prior to seeking relief in superior court. See RCW 34.05.534; Simpson Tacoma Kraft Co. v. Department of Ecology, 119 Wash.2d 640, 646, 835 P.2d 1030 (1992). The court will not intervene and administrative remedies need to be exhausted when the "relief sought ... can be obtained by resort to an exclusive or adequate administrative remedy." South Hollywood Hills Citizens Ass'n v. King County, 101 Wash.2d 68, 73, 677 P.2d 114 (1984) (quoting State v. Tacoma-Pierce County Multiple Listing Serv., 95 Wash.2d 280, 284, 622 P.2d 1190 (1980)).
The principle is founded upon the belief that the judiciary should give proper deference to that body possessing expertise in areas outside the conventional expertise of judges. South Hollywood Hills Citizens, 101 Wash.2d at 73, 677 P.2d 114; Retail Store Employees Local 1001 v. Washington Surveying & Rating Bur., 87 Wash.2d 887, 906, 558 P.2d 215 (1976) (citing Robinson v. Dow, 522 F.2d 855, 857 (6th Cir.1975)). The United States Supreme Court has stated in McKart v. United States, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969) the policies underlying this principle: (1) insure against premature interruption of the administrative process; (2) allow the agency to develop the necessary factual background on which to base a decision; (3) allow exercise of agency expertise in its area; (4) provide for a more efficient process; and (5) protect the administrative agency's autonomy by allowing it to correct its own errors and insuring that individuals were not encouraged to ignore its procedures by resorting to the courts. McKart, 395 U.S. at 193-94, 89 S.Ct. at 1662-63; South Hollywood Hills Citizens, 101 Wash.2d at 73-74, 677 P.2d 114.
Haggen asserts because Citizens did not appeal the city council's decision to approve the project to the Board, Citizens did not exhaust the "administrative remedies to the extent required by law." RCW 36.70C.060(2)(d). Due to this failure, Haggen argues Citizens did not meet the standing requirement for judicial review as set forth in RCW 36.70C.060.[2]
*1212 Under RCW 36.70A.280, the Board has a very limited power of review.
(1) A growth management hearings board shall hear and determine only those petitions alleging either:
(a) That a state agency, county, or city planning under this chapter is not in compliance with the requirements of this chapter, chapter 90.58 RCW as it relates to the adoption of shoreline master programs or amendments thereto, or chapter 43.21C RCW as it relates to plans, development regulations, or amendments, adopted under RCW 36.70A.040 or chapter 90.58 RCW; or
(b) That the twenty-year growth management planning population projections adopted by the office of financial management pursuant to RCW 43.62.035 should be adjusted.
RCW 36.70A.280(1)(a) and (b). Contrary to the position of Haggen, the challenge to the approval of the Haggen development by Citizens does not involve the issue of whether the Mount Vernon City Council properly complied with the GMA, but rather involves the effect of the comprehensive plan on specific land use decisions. The Board does not have jurisdiction over these types of issues and cannot provide the remedy or relief sought by Citizens.
Citizens' complaint does not assert that the comprehensive plan implemented by the city of Mount Vernon does not comply with the requirements of the GMA. Rather, Citizens allege that the approval of the rezone and the approval of this specific development project do not comply with the underlying zoning or with the comprehensive plan, and that the comprehensive plan cannot be used to make specific land use decisions. The Board is not able to render a decision on this issue because the approval granted by the city council falls outside the scope of review granted to the Board. Citizens sought to prevent the development of this property for a commercial use. The Board cannot render a decision on a specific development project; thus, Citizens properly brought the issue to the superior court for judicial review.
Haggen also agues Citizens cannot look to the courts for a remedy because Citizens failed to raise the issue of the rezone and the project approval specifically enough in the public hearing process. Haggen contends this failure eliminates Citizens' standing to challenge approval of the project in court.
As noted, exhaustion of administrative remedies is clearly required by RCW 36.70C.060 before a party will have standing to seek judicial review of a land use petition. The statute states nothing of the degree of participation or the specificity with which issues must be raised to seek judicial review. Traditionally, the doctrine of exhaustion looks to determine whether administrative remedies have been pursued. Fred P. Bosselman & Clifford L. Weaver, Judicial Review in Donald G. Hagman et al., Urban Planning & Land Development Control Law § 23.5 (2d ed.1986). The only administrative remedy available to Citizens under the Land Use Petition Act, prior to seeking review in superior court, was participation in the public hearings. The record reflects Citizens did participate, and Haggen makes no claim they did not.
This court has not specifically addressed how much participation at a public hearing is required to exhaust an administrative remedy. Haggen urges us to adopt precedent applying the Administrative Procedure Act's statutory exhaustion requirement. Prior cases may be helpful in understanding how exhaustion has been applied, but are not analogous or binding. In the present case, individual citizens were permitted to speak for three minutes before the city council; the cases cited by Haggen involve an administrative process that was more formal and more adversarial. See RCW 34.05.554; King County v. Boundary Review Bd., 122 Wash.2d 648, 860 P.2d 1024 (1993) (citing Griffin v. Department of Soc. & Health Servs., 91 Wash.2d 616, 631, 590 P.2d 816 (1979) and Kitsap County v. Department of *1213 Natural Resources, 99 Wash.2d 386, 393, 662 P.2d 381 (1983)).
One case applying the Administrative Procedure Act's statutory exhaustion requirement has established that prior to judicial review of an administrative action, the appropriate issues must first be raised before the agency. Boundary Review Bd., 122 Wash.2d at 668, 860 P.2d 1024. In order for an issue to be properly raised before an administrative agency, there must be more than simply a hint or a slight reference to the issue in the record. Boundary Review Bd., 122 Wash.2d at 670, 860 P.2d 1024. Our cases require issues to be first raised at the administrative level and encourage parties to fully participate in the administrative process. See, e.g., Boundary Review Bd., 122 Wash.2d at 670, 860 P.2d 1024; Department of Natural Resources, 99 Wash.2d at 393, 662 P.2d 381; Griffin, 91 Wash.2d at 631, 590 P.2d 816.
The record here reflects Citizens participated in all aspects of the administrative process and raised the appropriate project approval issues. Haggen suggests the issue is R-2A zoning; Haggen is wrong. The issue is the city council's ability to approve a commercial PUD in a residential neighborhood and on property zoned residential. The precise, legal argument is compatibility between the project and the underlying zoning. Citizens opposed the Haggen commercial development project before the city council on the grounds it was inconsistent with the comprehensive plan; that the Haggen proposal was not a neighborhood grocery store; and that the Haggen proposal was inconsistent with the residential zoning regulations surrounding the site. Citizens opposed the Haggen project through written correspondence to the city council and through testimony at the public hearings. The issue of zoning for this property was before the city council. The compatibility of a large commercial development project with the comprehensive plan, with the residential neighborhood, and with the residential rezone was before the city council.
Haggen contends Citizens' failure to specifically raise the technical, legal argument of compatibility between R-2A zoning and a commercial PUD demands the project be approved without an examination of the case on the merits. Individual citizens did not have to raise technical, legal arguments with the specificity and to the satisfaction of a trained land use attorney during a public hearing. The fact remains that the city council's approval of the commercial PUD project conflicted with the city of Mount Vernon's zoning regulations, undermined established Washington zoning precedent, and was illegal. Finally, Haggen suggests the compatibility problem between the R-2A zone and the commercial PUD could have been corrected by the city council; however, Haggen fails to explain how a zoning correction drastic enough to accommodate the commercial project would escape the vices of spot zoning. Here, Citizens exhausted its administrative remedies and has standing to seek judicial review of its land use petition.

Mount Vernon's Zoning Code
Haggen argues a commercial PUD is compatible with the R-2A rezone and the comprehensive plan. Haggen also asserts a commercial PUD is permitted in R-2A zones because PUDs are permitted under the terms of the Mount Vernon R-2A zoning regulations and because the comprehensive plan suggests some commercial development may be necessary in the area in which this site is located.
An examination of Mount Vernon's zoning code is necessary to determine the uses permitted on a site zoned R-2A and to determine how Mount Vernon resolves issues surrounding the complex nature of PUDs. This is a legal issue, which we review de novo. Sunderland Family Treatment Servs. v. City of Pasco, 127 Wash.2d 782, 788, 903 P.2d 986 (1995).
The purpose of Mount Vernon's R-2A zone and the uses permitted in R-2A zones are codified under Mount Vernon Municipal Code (MVMC) 17.21. The intent of the R-2A zone is "to provide for small areas within neighborhoods containing single-family attached dwellings in the form of `townhouses'...." MVMC 17.21.010. PUDs are permitted in R-2A zones under MVMC *1214 17.21.020(C), which states, "[p]lanned unit developments may be permitted according to procedures outlined in Chapter 17.66."[3] (Emphasis added.) PUDs are permitted, but the inquiry into the type of PUD permitted in R-2A zones cannot be answered without looking to MVMC 17.69.
The zoning code requires us to look to the procedures outlined in MVMC 17.69, planned unit development districts. First, MVMC 17.69.030 states:
Any uses permitted outright or as a conditional use in the zone where the PUD is located shall be permitted in a PUD, subject to the criteria established in this chapter; provided, that duplexes or multifamily dwellings may be permitted as a PUD in any residential zone. No use shall be permitted except in conformity with a specific and precise final development plan pursuant to the procedural and regulatory provisions of this chapter.
(Emphasis added.) The Haggen commercial PUD proposal is not a use permitted outright in the R-2A zone.
The Mount Vernon zoning code specifically separates residential PUDs from commercial PUDs. Haggen concedes this is not a residential PUD.[4] The Haggen commercial PUD is therefore governed by the commercial PUD section of Mount Vernon's zoning code, MVMC 17.69.410, business and commercial PUDs:
A. The foregoing PUD procedures may be employed in established business or commercial zones to encourage business or commercial site layout serving the public in a more satisfactory manner than generally would be possible with the conventional zoning regulations. The same general provisions apply to acceptability of a business or commercial PUD proposal as a residential PUD.
(Emphasis added.)
In order to comply with this section, the proposed commercial PUD must be located in established business or commercial zones which, as noted, this area was not. Planned unit developments are permitted in R-2A zones, but only in accordance with MVMC 17.69. By its own terms the zoning code explicitly prohibits the commercial planned unit development proposed by Haggen on a site zoned R-2A.

RCW 36.70B.030
Haggen's asserts Mount Vernon's comprehensive plan is the only required document necessary to make this specific land use decision. Haggen also states the comprehensive plan provides sufficient guidelines to approve the commercial planned unit development. Haggen cites RCW 36.70B.030 to support these arguments. RCW 36.70B.030(1) describes the project approval process:
(1) Fundamental land use planning choices made in adopted comprehensive plans and development regulations shall serve as the foundation for project review. The review of a proposed project's consistency with applicable development regulations, or in the absence of applicable regulations the adopted comprehensive plan, under RCW 36.70B.040 shall incorporate the determinations under this section.
Mount Vernon has adopted a comprehensive plan, Mount Vernon has existing zoning regulations, but Mount Vernon had not adopted specific development regulations as of the start of this action.
The present case presents a problem because the statute above suggests, and Haggen argues in its brief and during oral argument, a comprehensive plan can be used to make a specific land use decision. Our cases hold otherwise. In Barrie v. Kitsap County, 93 Wash.2d 843, 613 P.2d 1148 (1980), we held comprehensive plans generally are not used to make specific land use decisions. Instead, we stated a comprehensive plan is a "guide" or "blueprint" to be used when making land use decisions. Barrie, 93 Wash.2d *1215 at 849, 613 P.2d 1148. Although the court confirmed there need not be "strict adherence" to a comprehensive plan, any proposed land use decision must generally conform with the comprehensive plan. Barrie, 93 Wash.2d at 849, 613 P.2d 1148.
Since a comprehensive plan is a guide and not a document designed for making specific land use decisions, conflicts surrounding the appropriate use are resolved in favor of the more specific regulations, usually zoning regulations. A specific zoning ordinance will prevail over an inconsistent comprehensive plan. Cougar Mountain Assocs. v. King County, 111 Wash.2d 742, 757, 765 P.2d 264 (1988). If a comprehensive plan prohibits a particular use but the zoning code permits it, the use would be permitted. Weyerhaeuser v. Pierce County, 124 Wash.2d 26, 43, 873 P.2d 498 (1994). These rules require that conflicts between a general comprehensive plan and a specific zoning code be resolved in the zoning code's favor.
As explained earlier, the Haggen commercial PUD is not consistent with the underlying R-2A zoning regulations. If the commercial PUD is not consistent with the underlying R-2A zoning, the project cannot be approved despite general consistency with the comprehensive plan. Employing the rule stated earlier to the facts of this case, we find that when underlying zoning regulations explicitly prohibit a commercial PUD, but the comprehensive plan allows the development, the zoning regulations must govern the land use decision.

PUDs and Zoning
Haggen argues the city council's decision to approve the PUD, despite its apparent incompatibility with the underlying R-2A zone, was correct because MVMC 17.69.010 states the PUD is an overlay zone requiring a rezone and because the comprehensive plan requires rezoning through the PUD process. Haggen interprets the need for rezoning to imply the underlying zoning is immaterial to the land use analysis and the rezone is merely a "reversionary" zone should the PUD not be constructed. The trial court did not agree. It looked to the underlying R-2A zone, and held the commercial PUD could not be constructed in a R-2A zone because only those uses permitted in the underlying zone are permitted in the PUD and no commercial uses are permitted in a R-2A zone. Haggen's interpretation of Mount Vernon's zoning regulations and Washington case law is not correct.
The legal effect of approving a planned unit development is an act of rezoning. Lutz v. City of Longview, 83 Wash.2d 566, 568-69, 520 P.2d 1374 (1974). The following general rules apply to rezone applications: (1) there is no presumption of validity favoring the action of rezoning; (2) the proponents of the rezone have the burden of proof in demonstrating that conditions have changed since the original zoning; and (3) the rezone must bear a substantial relationship to the public health, safety, morals, or welfare. Parkridge v. City of Seattle, 89 Wash.2d 454, 462, 573 P.2d 359 (1978).
Haggen agrees the approval of a PUD is an act of rezoning, but Haggen has failed to demonstrate how conditions have changed to warrant a rezone. The record does not indicate and the trial court did not find this area had become a commercial or business area. Therefore, we will not address the issue of whether conditions have changed.
Haggen argued to this court, for the first time, the city council could have fixed the problem with the R-2A zoning and avoided the time spent in court by retaining Skagit County's original commercial zoning on the site. As we noted in Lutz, in certain circumstances, the approval of a planned unit development may constitute spot zoning. Lutz, 83 Wash.2d at 573-74, 520 P.2d 1374. Spot zoning is a zoning action by which a smaller area is singled out of a larger area or district and specially zoned for a use classification totally different from, and inconsistent with, the classification of surrounding land and not in accordance with the comprehensive plan. Lutz, 83 Wash.2d at 573-74, 520 P.2d 1374 (citing Smith v. Skagit County, 75 Wash.2d 715, 743, 453 P.2d 832 (1969)). The main inquiry is whether the zoning action bears a substantial relationship to the general welfare *1216 of the affected community. Save a Neighborhood Env't v. City of Seattle, 101 Wash.2d 280, 286, 676 P.2d 1006 (1984).
Professor Richard L. Settle wrote in Washington Land Use and Environmental Law and Practice,
The vice of "spot zoning" is not the differential regulation of adjacent land but the lack of public interest justification for such discrimination. Where differential zoning merely accommodates some private interest and bears no rational relationship to promoting legitimate public interest, it is "arbitrary and capricious" and hence "spot zoning."
Richard L. Settle, Washington Land Use and Environmental Law and Practice § 2.11(c) (1983) (footnotes omitted).
Spot zoning emphasizes why the planned unit development does not trump underlying zoning; if a planned unit development can be placed at any location within a city regardless of the underlying or surrounding zoning, as Haggen argues, it might raise issues of spot zoning and it might undermine the overall zoning plan. Planned unit developments allow for flexibility in planning, in design, or in density. They do not permit ad hoc land use decisions merely because a developer has decided to employ the PUD process.
The commercial use proposed by Haggen is inconsistent with, and distinctly different from, the surrounding neighborhood zoning. As this court stated in Lutz:
[T]he PUD achieves flexibility by permitting specific modifications of the customary zoning standards as applied to a particular parcel. The developer is not given carte blanche authority to make any use which would be permitted under traditional zoning.
Lutz, 83 Wash.2d at 568, 520 P.2d 1374. The PUD process does not override underlying zones, nor does a PUD trump specific zoning regulations.

CONCLUSION
Citizens exhausted its administrative remedies and adequately identified the issues and objections to the project to have standing to bring this challenge.
Although RCW 36.70B.030 requires the comprehensive plan be used as the foundation for project review in the absence of development regulations, a proposed project must generally conform to the comprehensive plan. Even if the Haggen commercial PUD generally conformed to the comprehensive plan, the proposal directly conflicts with the underlying R-2A zoning regulations. The zoning regulations prohibit this type of development in a R-2A zone. This conflict is resolved in favor of zoning regulations. Additionally, approval of a planned unit development is an act of rezoning, which must be accompanied by a showing of significant changed circumstances. No such showing was made which would justify approval of the project in this case.
The decision of the superior court is affirmed.
DURHAM, C.J., and DOLLIVER, SMITH, ALEXANDER and TALMADGE, JJ., concur.
SANDERS, Justice (dissenting).
Although the majority discusses several different issues, at the end of the day it reverses the Mount Vernon City Council, concluding this commercial project is inconsistent with the city's R-2A residential zone. Had this been a commercial zone the majority would have affirmed the council by the same logic.
Assuming the majority is correct on the merits, we still must ask if the court is at liberty to decide the merits, given our prior pronouncements on the necessity to raise appropriate objections before an administrative agency to test their disposition on subsequent judicial review. Compare King County v. Boundary Review Bd., 122 Wash.2d 648, 860 P.2d 1024 (1993) ("[C]ase law has established that prior to judicial review of an administrative action, the appropriate issues must first be raised before the agency." Majority at 1212 (citing Boundary Review Bd. at 668, 860 P.2d 1024)). Preservation of the zoning issue for judicial review is the problem hereand it is a very great problem because, in point of fact, the Citizen group never claimed at the administrative level this *1217 project (or the proposed PUD which embodied the project) would violate the R-2A zone. It is that simple.
Of course, there were many other objections raised but never this one. Able counsel for the Citizens submitted to the city council a detailed letter in opposition to the project raising several concerns,[1] but not zoning. Many citizens spoke to and wrote the council in opposition to the project; however, none simply stated project approval would violate the R-2A zone. About as close as the record comes to a proper objection is the claim that the proposal would place a commercial project in a residential neighborhood; however, while this might constitute notice of a claim of potential neighborhood incompatibility, it is hardly notice of a claimed zoning violation as the specific requirements of the zoning ordinance cannot be determined by the character of the prior actual use.
In response the majority states:
The record here reflects Citizens participated in all aspects of the administrative process and raised the appropriate project approval issues. Haggen suggests the issue is R-2A zoning; Haggen is wrong. The issue is the city council's ability to approve a commercial PUD in a residential neighborhood and on property zoned residential. The precise, legal argument is compatibility between the project and the underlying zoning.
Majority at 1213. The subtlety of the majority's distinction escapes me. What is the difference between stating "the issue is R-2A zoning" on the one hand and "the city council's ability to approve a commercial PUD in a residential neighborhood and on property zoned residential" on the other? While the majority states Citizens "raised the appropriate project approval issues" (Majority at 1213), in fact Citizens did not raise the issue in any form.
Failure to raise the R-2A zone claim before the city council is so obvious upon this record it simply does not permit denial. It was obvious to both parties, as well as the superior court judge, when judicial review was first conducted. Hence, it was then the claim of the Citizen group that specifically raising the zoning objection as a condition to judicial review should be excused as imposition of such a requirement would be too great a burden on the Citizen participants. Verbatim Report of Proceedings (RP) (Feb. 13, 1996) at 166.[2] Accepting the Citizens' argument, the superior court legally erred when it agreed the zoning objection need not be specifically raised to be preserved for judicial review. Notwithstanding its legal error the superior court correctly identified the precise issue when it asked whether there is a legal requirement "that one of the persons before that City Council had to say, listen R-2A is the wrong zone for this and these are the reasons." RP (Feb. 13, 1996) at 163.
Responding to this question the project proponent replied, "Absolutely." Id. He was correct that Boundary Review Bd. says just that. The majority agrees Boundary Review is applicable and even admits it stands for the proposition "[i]n order for an issue to be properly raised before an administrative agency, there must be more than simply a hint or a slight reference to the issue in the record [citing Boundary Review at 670, 860 P.2d 1024]." Majority at 1213. Yet the majority subverts in practice the very rule it articulates in theory. If the rule is not to be applied consistently, it is better we have it not at all, as the reasons asserted for its *1218 adoption and continued vitality are thereby defeated and its continued existence simply becomes an open invitation for discriminatory enforcement.
A review of the facts of this case demonstrate if ever the rule has a reason, the reason is served by application here.
We begin by recalling the proposed situs of the project (Haggen's tract) originally lay in an unincorporated, commercially zoned island of Skagit County surrounded by the Mount Vernon municipality. The original county zoning on Haggen's tract was commercial/limited industrial (C-LI) and public.[3] As a matter of fact, the original development proposal was submitted at a time when the property was zoned commercial by the county.
However, the proponents saw it advantageous to encourage annexation of the tract into the Mount Vernon municipality and essentially packaged up a proposal for annexation with a proposal that the newly annexed property be appropriately zoned to accommodate the proposed development.
Given the present reality that a man's desire to improve his property is often cast in terms of a political question, the proponent realistically attempted to persuade the appropriate governmental decision-makers to adopt those actions necessary to allow the project to proceed. And, of course, those who disagreed with that objective attempted to marshal whatever political resources at their disposal to make sure this did not happen.
Eventually all met before the city council which convened to adopt the annexation, proposed zoning, and PUD proposal as a package. It is fair to say, and I do not think it is subject to dispute, the matter had progressed this far because it was driven by the natural desire of the project proponent to have whatever legislative action taken as was necessary for project approval. Decidedly the action ultimately taken was not an academic exercise in land use planning for the coming centuryrather, all had gathered together to do battle over a proposed supermarket. The learned superior court judge understood the reality of this record very well upon his initial review, although he disagreed in legal consequence:
It's abundantly clear to this Court that the decision of the City was project driven. Such appears clear. Haggen was in there with the City staff at least six months before the Comprehensive Plan was adopted. Haggen proposed the annexation, proposed the zoning, but it strikes me that the City decided it was going to put this plan in place and it did, but wrongfully as far as this Court is concerned. So the decision was molded to accommodate the Haggen project proposal....
RP (Feb. 16, 1996) at 7. Given that the annexation and the proposed zone adoption was "project driven," it is an undeniable inference that the council indeed intended to do what was necessary to lawfully approve the project. Certainly it was within their legislative prerogative to adopt a commercial zone compatible with their comprehensive plan, especially for property previously zoned commercial prior to annexation. In fact, with the same result, the council could have approved the annexation without adopting any zone at all! Moreover, the comprehensive plan, adopted in January 1995, targeted the area containing the Haggen tract as one available for a retail center, which is defined as a commercial outlet of fewer than 70,000 square feet on no more than 10 acres. Administrative Record at 1325-27. (Haggen's proposed retail center is a 63,000-square-foot supermarket on 8.3 acres.)
However, the council adopted an R-2A zone at the same time it approved the annexation and commercial PUD, unmistakably evidencing its intention that the project be approved although, according to the majority, mistaking the law in the process. The failure of a project opponent to object on zoning grounds before final action presents an important added dimensionthe failure to timely object removed the only realistic prospect *1219 that the council would cure the objection while saving the project by simply adopting a commercial zone compatible with this "project driven" proposal. But the objection was not made until long after it was too late for the council to take corrective action.
I do not assume the objection was intentionally withheld; however, under the majority's scenario there is every reason why it could have been with the same result. Certainly that would have been to the profit of the opponent. Indeed, any attorney worth his salt would specifically counsel opponents to withhold such objection for fear the council would timely correct its error, thereby making the project all the less vulnerable to subsequent legal attack on judicial review. Such is precisely one of the reasons we have stated the rule as set forth in Boundary Reviewto preserve an objection for judicial review it must first be asserted to the agency to allow the agency to avoid its own error.
In Boundary Review one of the issues on judicial review was whether a particular King County ordinance applied to prohibit the subject land annexation. 122 Wash.2d at 668, 860 P.2d 1024. The interested landowner defended by asserting the theory had never been presented to the county agency, and therefore the opponents had not adequately exhausted their remedies. In response, the opponents (very much like the case before us) asserted they had generally raised the issue below, even if they had not done so specifically. But on review this court held petitioners must raise their theory with specificity below or it is lost. Id. at 669, 860 P.2d 1024. The court noted while the opponents "presented extensive testimony before the Board" in opposition to the annexation, they "never mentioned the ordinance" and "never argued to the Board that the proposed annexations were prohibited by Ordinance 9849...." Id. at 669, 860 P.2d 1024. Because the opponents never argued their precise theory before the agency, we refused to consider it. Id. at 669, 860 P.2d 1024 ("[W]e decline to consider the effect of Ordinance 9849 because it was not raised before the Board."). We explained, "This rule is more than simply a technical rule of appellate procedure; instead, it serves an important policy purpose in protecting the integrity of administrative decisionmaking." Id. at 668, 860 P.2d 1024. We noted it furthered important purposes of:
(1) discouraging the frequent and deliberate flouting of administrative processes; (2) protecting agency autonomy by allowing an agency the first opportunity to apply its expertise, exercise its discretion, and correct its errors; (3) aiding judicial review by promoting the development of facts during the administrative proceeding; and (4) promoting judicial economy by reducing duplication, and perhaps even obviating judicial involvement.
Id. at 669, 860 P.2d 1024 (quoting Fertilizer Inst. v. United States Envtl. Protection Agency, 935 F.2d 1303, 1312-13 (D.C.Cir. 1991)). As we held in Boundary Review: "In order for an issue to be properly raised before an administrative agency, there must be more than simply a hint or a slight reference to the issue in the record." 122 Wash.2d at 670, 860 P.2d 1024.
The case before us presents the prototypical example of why this rule exists. Had a proper objection been made at the administrative level, several years of judicial appellate proceedings could have been avoided as well as the no doubt substantial cost associated with this litigation, not to mention the delay and consequential damage to those whose interests were dependent upon the outcome of this review. Most importantly, the city council could have avoided the error to begin with by adopting a zone ordinance compatible with this project and beyond justified legal objection. To this the majority responds:
Finally, Haggen suggests the compatibility problem between the R-2A zone and the commercial PUD could have been corrected by the city council; however, Haggen fails to explain how a zoning correction drastic enough to accommodate the commercial project would escape the vices of spot zoning.
Majority at 1213. I find this argument less than persuasive. Indeed, it is no argument at all. Whatever Mr. Haggen did or did not do has no bearing whatsoever on the adequacy of the Citizens' presentation. It certainly *1220 was not incumbent upon Mr. Haggen to justify a zoning ordinance which the city council did not pass. Beyond that, the majority seems to forget the subject property was acquired through annexation and, by national majority rule, annexed land comes into the acquiring jurisdiction unzoned, thereby permitting any use not a nuisance per se. See, e.g., Ben Lomond, Inc. v. City of Idaho Falls, 92 Idaho 595, 598-99, 448 P.2d 209 (1968) (citing 101 C.J.S. Zoning § 134, at 892 and other authorities). Cf. Olympic View-Mukilteo Action Group v. City of Mukilteo, 97 Wash.2d 707, 710, 649 P.2d 116 (1982) (referencing the claim that annexed acquisitions are unzoned, the court found this land was zoned by simultaneous ordinance to retain its unincorporated zoning designation); RCW 35A.14.330 (code city may prepare proposed zoning ordinance to be effective on annexation). The same result would even follow under the minority rule, which generally holds that newly annexed property retains its previous zoning designation, here commercial. Given (1) the lack of legal necessity to zone at all, (2) the commercial zoning prior to annexation, and (3) the Mount Vernon comprehensive plan which designated this parcel and environments suitable for a commercial zone, I suspect it would take the presence of factors not apparent from this record to persuade any court the adoption of a commercial zone for this area would be somehow invalid. In short, the whole tenor of the majority's claim regarding what Mr. Haggen "fails to explain" and/or the "vices of spot zoning" testifies to the very weakness of its argument on the issue it will not confront: the zoning objection has not been preserved for judicial review because it was not properly raised at the administrative level.
If the majority were to overrule that line of cases which requires an administrative litigant to state an objection in order to preserve it for judicial reviewhaving determined, for example, the requirement placed an unfair burden on litigants at the administrative levelat least that result would provide some prospective consistency and clarity. Unfortunately, however, we now have a rule of unknown dimensions, finding honor only in its breach, which is simply an open invitation to confusion and discriminatory enforcement. I dissent.
MADSEN and GUY, JJ., concur.
NOTES
[1] The land use petition is the new process the Legislature has established for parties seeking judicial review of local land use decisions. This process replaces the writ system. See RCW 36.70C; Laws of 1995, ch. 347.
[2] RCW 36.70C.060(2) states in part:

"Standing to bring a land use petition under this chapter is limited to the following persons:
. . .
"(2) Another person aggrieved or adversely affected by the land use decision, or who would be aggrieved or adversely affected by a reversal or modification of the land use decision. A person is aggrieved or adversely affected within the meaning of this section only when all of the following conditions are present:
"(a) The land use decision has prejudiced or is likely to prejudice that person;
"(b) That person's asserted interests are among those that the local jurisdiction was required to consider when it made the land use decision;
"(c) A judgment in favor of that person would substantially eliminate or redress the prejudice to that person caused or likely to be caused by the land use decision; and
"(d) The petitioner has exhausted his or her administrative remedies to the extent required by law."
[3] Although this section states the procedures are found in MVMC 17.66, this is a typographical error. Planned unit development districts are governed by MVMC 17.69.
[4] Haggen made this concession because MVMC 17.69.400(C) and (D) require the commercial portion of a residential PUD to be built after the residential portion it is designed or intended to serve, and the commercial portion must primarily serve the residents of the PUD.
[1] On September 20, 1995, a detailed letter was hand-delivered to the city council on behalf of the Citizens group outlining five specific objections to the proposal (which I paraphrase):

1. Development regulations were not adopted to implement the comprehensive plan;
2. The comprehensive plan and map is incomplete;
3. The proposed development is not permitted under the comprehensive plan;
4. The proposal is not supported by an appropriate economic analysis;
5. The subject proposal is not vested.
Administrative Record at 1247-1250.
[2] The Citizens' attorney argued to the court: "Its [requirement that specific objection be raised has] never been applied to citizens and when the Court looks at what citizens are required to do, we go back to Sterling v. Spokane County [, 31 Wash.App. 467, 642 P.2d 1255, review denied, 97 Wn.2d 1041 (1982)]."
[3] Apparently some 20 to 39 acres were C-LI. Such C-LI uses include any business use and any commercial use, even specifically including on-site hazardous waste treatment. Skagit County Code § 14.04.070.